MASON *v.* BOARD OF MANAGERS OF MICHIGAN SOLDIERS' HOME.

1. SOLDIERS' HOME — PUBLIC OFFICERS — CHARITIES — PUBLIC IN-
STITUTIONS—ARMY—PENSIONS.
    The purpose of establishing the Michigan soldiers' home (1 Comp. Laws, § 2055 *et seq.,* 2 How. Stat. [2d Ed.] §§ 3716-3728) was to provide a refuge or home for that class of honorably discharged veterans who, disabled by disease or wounds or otherwise from earning their living and having no adequate means of support, would, without public aid, become objects of common charity. The law does not contemplate that the board of managers shall admit as inmates of the home any self-supporting, honorably discharged soldiers, however worthy, and allow them, in case they so desire, to pay for their care and maintenance, in whole or in part. If the soldier's pension is adequate to support him, or, added to his other resources, renders him self-supporting, he is not entitled to admission to the home as an inmate.

2. SAME—PENSIONS.
    Besides this condition, the statute imposes no others, and there is no provision in the law that the members of the

class entitled to admission shall contribute from their pensions or other resources towards their maintenance.

3. SAME—BOARD OF MANAGERS—RULES.

And no power was delegated by the legislature to the board of managers to include in the rules and regulations which it was authorized to adopt for the government of the home, a condition requiring the applicant for admission to contribute from his pension; but they may, if it is deemed necessary to preserve order, enforce discipline, or preserve the health of the inmate, require him to deposit the pension money so received.

4. SAME—EQUITY.

Hence, in a suit in equity instituted by inmates of the Michigan soldiers' home against the board of managers of that institution to enjoin the requirement by rule of a deposit of such pensions received from the United States, and to obtain an accounting of funds so withheld, evidence tending to show that the inmates of the home were misled into the belief that the statutes required the deposit of their pension money and that they were threatened with dismissal if they did not conform to the requirement, warranted a decree in favor of the complainants, and the contention of the defendants that the money was voluntarily paid to them is overruled. *Held*, also, that, notwithstanding the transfer of such moneys from one fund to another, the amounts belonging to deceased soldiers and discharged inmates were a trust fund for the benefit of the heirs or other persons by law entitled to share in their estate or of the depositary in person, and should be accounted for with interest at 5 per cent.; that other moneys, not earning any interest, should be returned and that no deposit can be required, except in pursuance of some rule or regulation promulgated for the necessary purpose of discipline.

5. STATES—ACTIONS—PARTIES.

A suit for an accounting against the board of managers of the soldiers' home for pension money deposited by inmates of the institution is not a proceeding against the State.

Appeal from Kent; McDonald, J. Submitted January 29, 1914. (Docket No. 150.) Decided July 24, 1914.

Bill by Orange S. Mason and others against the board of managers of the Michigan soldiers' home for an injunction, accounting and other relief. From a decree for complainants, defendants appeal. Modified and affirmed.

*Grant Fellows,* Attorney General, and *David H. Crowley,* Assistant Attorney General, for appellants.

*A. A. Ellis* and *S. Wesselius,* for appellees.

STEERE, J. The ultimate question presented by this record is whether the board of managers of the Michigan soldiers' home at Grand Rapids ever had the right to take and retain permanently all or any part of the pensions of inmates of that institution.

Defendants have appealed from a decree of the circuit court of Kent county, in chancery, awarding $8,373.14 to 126 of the 206 complainants, in sums ranging from $4.95 to a maximum of $541.86 (principal and interest), being pension money received by said complainants from the United States government while residents of said soldiers' home, and retained by defendants under rules and general orders adopted and promulgated by said board of managers in cases where the individual pensions exceeded $12 per month.

The original bill of complaint herein was filed September 4, 1909, by Orange S. Mason, since deceased, in his own behalf and that of others, to restrain enforcement of a general order promulgated by the defendant board of managers, requiring all inmates of said home to surrender all pension money received by them in excess of $12, or in exceptional cases $15, per month to the authorities of the institution, to be permanently retained and ultimately turned into the general State fund. Subsequently all parties who are now complainants were made parties to said bill of complaint by an order of the court.

Upon the filing of such bill a preliminary injunction was issued restraining the defendants from enforcing the provisions of said order. Defendants demurred to said bill, later amending said demurrer, alleging, among other reasons, that the suit instituted by complainants was in fact a suit against the State of Michigan, and therefore could not be maintained without the consent of the State; that said board of managers was an agency of the State, and defendants possessed only limited powers especially provided by law, not including the right to sue and be sued in the courts of the State of Michigan. Complainants' bill was later amended, and a plea was filed by defendants to said amended bill, followed by a replication of complainants. Thereafter a stipulation between the parties provided that the suit should be brought on for hearing upon the bill of complaint and plea on a date fixed, at which time, by permission of the court, complainants' replication was withdrawn, and an amended bill filed praying for an accounting by defendants for the moneys collected from complainants as alleged, and asking for an injunction restraining defendants from discharging any of complainants from said home until the further order of the court, from collecting or appropriating any money due complainants as pensioners of the civil war, from compelling them to sign receipts or transfers for any money due them as pensioners of the United States government, and from transferring or setting over any moneys received by defendants as aforesaid to the general fund of the State of Michigan. A plea was then filed by defendants to said amended bill fairly putting in issue all material questions raised by said amended bill and involved in this controversy, with a general denial of complainants' right to the relief asked. A later replication filed by complainants finally concluded the protracted pleadings, and the

suit was brought to a hearing on March 4, 1913, upon pleadings and proofs taken in open court.

The trial court rendered an opinion that said board of managers of the Michigan soldiers' home had no authority, under the law creating such institution, to make rules by which any part of the soldiers' pensions received from the United States government could be permanently taken from the inmates of the home and appropriated by the board; the gist of said opinion being as follows:

"If soldiers, sailors, and marines come within that class which entitles them to the benefits of the home, they are entitled to the enjoyment of such benefits, without payment therefor. If not entitled to the benefits of the home, they should not be admitted. The State gave the board no authority to contract with those not eligible for admission to the home. It did not intend to give the board of managers any authority to deal with any except those entitled to the benefits of the home. It was not intended that the institution should be supported in any way by contributions from the pensioners."

The Michigan soldiers' home was established by Act No. 152, Pub. Acts 1885 (2 How. Stat. [2d Ed.] § 3716 *et seq.*); entitled:

"An act to authorize the establishment of a home for disabled soldiers, sailors, and marines in the State of Michigan."

By section 2 of said act the general supervision and government of said soldiers' home is vested in a board of managers consisting of six members appointed by the governor by and with the advice and consent of the senate.

Section 8 provides:

"It shall be the duty of the board of managers to meet once in every three months, on their own adjournment, and oftener if they shall deem it advisable, at which meeting they shall prepare and carefully digest and mature a system of government for said

home, embracing all such rules, regulations, and general laws as they may deem necessary for preserving order, for enforcing discipline, for preserving the health of such disabled soldiers, sailors, or marines as may be received at this home."

Other parts of the act, of minor importance here, provide for the selection by said board of a treasurer and clerk from their own body and a commandant for said home, with such subordinate officers and employees as may be necessary. Provision is also made by subsequent legislation for establishing upon the same premises and under the same management a home for the wives and mothers of such disabled soldiers.

Section 11 of said act provides in part as follows:

"All honorably discharged soldiers, sailors and marines, who have served in the army or navy of the United States in the late War of the Rebellion [or in the Mexican War], and who are disabled by disease, wounds, or otherwise, and who have no adequate means of support, and by reason of such disability are incapable of earning their living, and who would be otherwise dependent upon public or private charity, shall be entitled to be admitted to said home, subject to the rules and regulations that shall be adopted by the board of managers to govern the admission of applicants to said home."

This section also requires a previous residence of one year in the State, unless the applicant served in a Michigan regiment or was accredited to the State of Michigan, and subsequent amendments provide for the admission to said home of soldiers, sailors, and marines who have served in the Spanish-American or Philippine wars upon the same conditions.

This court, in construing the law creating the soldiers' home, has defined it as an eleemosynary institution; the purpose of its existence being to dispense to a favored but dependent class a well-bestowed and

deserving charity. The language of the act admits of no other construction. Its object was to furnish a home, which would be a more congenial and fitting refuge than the ordinary charitable institution, to that class of honorably discharged veterans who, disabled by disease, wounds, or otherwise from earning their living, and having no adequate means of support, would otherwise become objects of common charity. *Wolcott* v. *Holcomb,* 97 Mich. 361 (56 N. W. 837, 23 L. R. A. 215).

In its general scope the law does not contemplate, nor by its language does it permit, that the board of managers shall admit as inmates of the home any self-supporting, honorably discharged soldiers, however worthy, and allow them, in case they so desire, to pay for their care and maintenance in whole or in part, as is the law in some other States which extend the privileges of the home to veterans whose financial condition would bar them from regular admission. A soldier's pension is not a charity, but a reward won, or compensation earned, by services rendered to his country, to which he is entitled, wholly regardless of his financial circumstances, and which is paid alike to the rich and poor. Comparatively few of those entitled to, and who receive, soldiers' pensions are entitled to admission to the soldiers' home. If a soldier's pension is adequate to support him, or, added to his other resources, renders him self-supporting, he is not entitled to admission to the home as an inmate. If, though receiving a pension, his means of support are not adequate, and he is incapable of earning a living, and his status is such that, unless admitted to the home, he would have to be supported by charity in whole or in part, he is entitled to admission. That is the test. The statute creates no grades or degrees in that particular, and imposes no conditions beyond that. There is no suggestion in the law that those of

181 Mich.—23.

the class entitled to admission shall contribute from their pensions or other scant resources which they may have towards their maintenance. The legislature might have so provided; but it did not. In some of our sister States such conditions were imposed, and the Federal law creating national soldiers' homes first expressly provided that applicants must surrender their pensions as a condition of admission; but subsequent legislation to the contrary has removed those conditions for admission to the national soldiers' homes, and the same course has been followed by most of the States. A report of inspection of State soldiers' and sailors' homes for the year 1910, made by the inspector general of the national home for discharged soldiers, shows that of 54 such institutions scattered throughout the United States only 5 exact any part of the inmate's pension for his maintenance or the support of the home.

It is contended in behalf of defendants that under the provisions of sections 8 and 11, above quoted, power was delegated to the board by the legislature to include in the rules and regulations which it was authorized to adopt for a system of government of the home the condition of admission requiring contributions from pensions now in controversy, and that such authorized rules and regulations when adopted and promulgated have all the force and effect of a statute.

The question of what power was delegated by statute to the board came before this court in *Loser* v. *Board of Managers*, 92 Mich. 633 (52 N. W. 956). In that case a mandamus was asked to compel respondents to vacate a rule, numbered 14, and a general order based upon it, requiring every pensioner admitted to the home who received a pension in excess of $5 per month to turn the excess over to the commandant, subject to the disposal of the board of

managers, and providing that if an improper use was made of the $5 allowed to be retained leading to infractions of rules of the institution, such allowance should be suspended; also directing that the commandant ascertain as soon as possible the wife, dependent children, or parents of the inmates receiving pensions, and cause the money so received from the pensioners to be sent to them, or, in case no one was dependent upon any pensioner, the money so received from him should be held by the board and ultimately paid back to him upon his final discharge from the home. The position then taken by the board of managers is not in harmony with the present attitude of the board. It then, in effect, disclaimed any purpose or right to permanently retain or appropriate the money taken from pensioners, and urged in justification of the rule that it was adopted for the sole purpose of enforcing discipline and maintaining order, and that without such rule it would be impossible to do so. Approving this contention as well founded so far as it applied to temporarily taking control of the pensioner's money, the court said:

"We think it is within the power of the board to require the pension money of the inmates to be deposited, if, in the words of the statute, they deem it necessary to preserve order, enforce discipline, or preserve the health of the inmates."

The permanent retention of a former inmate's pension after he is dead or discharged could scarcely be urged as necessary to enforce discipline, preserve order or health.

The significance of that opinion as applied to this case is found in that portion dealing with the provision of rule 14 requiring the commandant to ascertain the dependent relatives of inmates who drew pensions, and to pay the deposited portions of the pensions to such relatives. While recognizing that the act lodged a broad discretion with the board, in the

management and government of the institution, which courts would not interfere with, unless a very clear case of abuse was shown, the court in that connection very plainly indicated the limit of such discretion in handling the pensions of inmates, as follows:

"We do not, however, think that the statute confers upon the board the right to determine what relatives are dependent upon the pensioner for support, and to direct how much of such money shall be sent to such relatives. To this extent, therefore, rule 14 is void, and must be vacated."

It is true, as claimed by defendants, that the question, directly in issue here, of the right of the board to for all time deprive the inmate of any part of his pension money and permanently appropriate it to support of the home was not raised, for the manifest reason that no such right was claimed or suggested; but when this court squarely held that the right of the board did not even extend to permanently depriving the inmate of his money for the apparently laudable and equitable purpose of applying it to the support of his dependent relatives, whom it was his natural and legal duty to support, if able, we see little room for argument as to the indicated limit of the board's authority in making final disposition of this money. To impose the condition requiring inmates to pay the institution in whole or in part for their maintenance, whether out of the pensions received or from other sources, is not to be treated as an abuse of discretion, but rather as an attempted exercise of a discretion which the law did not authorize.

It is urged in behalf of defendants that in other States, under similar statutes, the right of managing boards of soldiers' homes to take and appropriate the pensions of inmates has been universally upheld, citing, in support of this contention, the following cases: *Ball* v. *Evans*, 98 Iowa, 708 (68 N. W. 435) ; *Howell* v. *Sheldon*, 82 Neb. 72 (117 N. W. 109) ; *Treadway*

v. *Board of Directors,* 14 Cal. App. 75 (111 Pac. 111) ;
*Brooks* v. *Hastings,* 192 Pa. 378 (43 Atl. 1075) ;
*O'Donohue* v. *Soldiers' Home,* 65 N. J. Law, 484 (47
Atl. 452). These cases involve the question raised
here as applied to the statutes of the respective States.
To the extent they are in conflict with *Loser* v. *Board
of Managers, supra,* they cannot be regarded as con-
trolling. Some of them are distinguishable in marked
particulars. In *Ball* v. *Evans, supra,* the distinction
is pointed out in the opinion. The Iowa statute cre-
ating the home did not define who was entitled to ad-
mission. Section 2 of the act provided that:

"The board of commissioners shall determine the
eligibility of applicants for admission to the home."

The *Loser Case* is cited in the opinion, and, amongst
other things, it is said:

"In that case the court sustained rules similar to
those here in controversy. So much of one rule was
declared invalid as determined what relatives were
dependent upon the pensioners for support, and di-
rected how much of his pension money should be sent
to such relatives. This holding was based upon the
ground that the statute of Michigan did not authorize
the board to determine that matter. Even that hold-
ing would not obtain here, for our statute authorizes
the board to determine the question of the eligibility
of applicants for admission to the home."

*Treadway* v. *Board of Directors, supra,* is devoted
chiefly to construing the California statute; the rules
of the board being of minor significance. The follow-
ing excerpt from the opinion indicates the principal
question at issue, and the view of the court upon a
condition relative to retaining any remaining pension
money, of deceased inmates, expressly authorized by-
statute:

"The law does not purport to affect 'the estates of
deceased persons' or 'change the law of descent or
succession,' and was intended for no such purpose; it

merely extends to the class of persons indicated the benefits and privileges of the home on certain conditions. In the particular complained of applicants agree that their pension money shall be paid to the treasurer of the home from time to time as received to be held for their personal benefit and use while members, and without having made other disposition of it, any balance unexpended shall go to the home for the benefit of all the members, subject to the right of certain named persons to this balance if called for within a stated period—five years. It cannot be said that this regulation is harsh or burdensome or ungenerous, for the applicant is supposed to be in indigent circumstances when admitted, having no one under any legal obligation to support him, and it is only when the member dies intestate that the law operates to dispose of any balance to his credit, and to this he agreed when admitted as a member."

*Howell* v. *Sheldon, supra,* was based on the Nebraska statute, differing from that of Michigan in the particular that the board was not only required to prescribe rules for admission, but authorized to admit as inmates old soldiers, otherwise qualified, upon payment by them of their board if they so desired, thus giving the board a discretion not conferred by our statute. Though impelled to hold that the rule complained of was within the discretion of the board, the court suggested that:

"If the legislature believes the rule to be harsh, unnecessary, or inexpedient, it can limit the power of the board as to its right to require the payment of any part of the pensions of the inmates for the support of the institution, and thus conform the rule in this State to that in the majority of those States maintaining like institutions."

In the Pennsylvania and New Jersey cases special circumstances are shown under which the inequity of granting a recovery was emphasized, and the courts held that the payments were voluntarily made and could not be subsequently recovered, as the testimony

clearly disclosed that the pensioner when applying for admission distinctly understood and freely agreed to the arrangement.  Those cases being, however, chiefly based on the doctrine of contract obligations, the courts necessarily held, in substance, that the managing boards had power to impose such conditions and, in effect, make contracts with applicants for permanent surrender of their pension money received while inmates.  So far as those opinions disclose, their statutes are quite similar to that of Michigan, though not identical, and, to the extent the conclusions reached by those courts as to authority of the boards are at variance with the tenor.of the *Loser Case,* they cannot be followed; but, aside from that question, there is testimony in this case that much misunderstanding and confusion existed at times in the minds of inmates as to how their pensions were to be treated. They all signed an agreement, when making application for admission, to abide by the rules and regulations of the home, and knew they were required to deposit their pension money with the officials.  As to their further consent and understanding, the testimony is not clear and unquestioned, as it was in the New Jersey and Pennsylvania cases.  In this case numerous changes in the rules and forms of application were made from time to time.  Subsequent to the time of disavowing in this court any purpose to permanently appropriate any part of the pension money inmates were required to deposit, rules to the contrary were adopted, and the conditions of admission so indicating were, as a rule, printed on the back of applications, under headings, purporting to be portions of the law creating the home.  The various complainants in this suit were admitted at different times, under several different forms of application.  Inmates, as they were admitted, discharged, and readmitted.from time to time, often paid little attention to and apparently did not have distinct knowledge or

clear understanding of the significance of the printed matter on the back of their applications. The records show that men were admitted, discharged, and readmitted as often as ten different times, or more. As a result of the varying forms of application and the manner in which inmates were received, complainants claim they did not voluntarily and understandingly consent to permanently surrender their pensions, but were misled or coerced into so consenting so far as it appears they did consent. In some instances they testify to being misled into signing their applications by the form used, believing that the rules were part of the statutes of the State; in others that attention was not called to the rules at all; in others that the rules were promulgated after their admission, and either not made clear to them, or, in cases where they were, and protest was offered, they were told that refusal to abide by the rules would result in dishonorable discharge, which would preclude admission to any other soldiers' home. The evidence shows opportunity for confusion and misunderstanding upon that question.

The board had authority under the statute to insist, as a police regulation, and did insist, that the applicant deposit his pension with it while he was an inmate, in this way coming lawfully into possession of his money. The inmate necessarily knew this. Upon that there could be no misunderstanding, and his consent to that course was binding. Beyond that, even if he did acquiesce in the proposal to thereafter retain and permanently appropriate part of the money so received to the purposes of the home, such consent, if imposed as one of the conditions of becoming or remaining an inmate under a mistaken belief that such was the law, was exacted without legal authority, and could not be sustained as a binding contract. We think this is a necessary conclusion from the construction of our statute and the limit fixed upon the author-

ity of the board in *Loser* v. *Board of Managers, supra.*

A claim is made of legislative authority to permanently appropriate this money under an act of the legislature passed in 1905 (Act No. 313), which provided that money accumulated in the "post fund" and "posthumous fund" might be used to furnish the hospital and for certain other purposes to the benefit of the home and its inmates. The testimony shows a somewhat confused condition of accounts in the books of the institution at times, and Charles P. Coffin, adjutant of the home, who was in charge of, or had access to, all the books, records, and documents, and during his incumbency made a portion of the records showing the different funds and the sources from which they came, furnished a list of the amounts of excess pension received from the different complainants, which are admitted by defendants, and are taken as the bases of the decree. He testifies to difficulties encountered in making up such list, and says he "spent nights and Sundays going through these books" to make his compilation; that he made mistakes—

"But, so far as I know, it is pretty near correct, and especially from data I could get hold of to compile it with. * * * I do not think the treasurer's report is kept in such a way that I can point out the amount of pension money taken from residents of the home."

Various fund accounts were kept from time to time known as "post fund," "posthumous fund," "home pension fund" and "excess pension fund." The witness states that in 1905 the "post fund" was a small account, and in his opinion the money in it was received from other sources; said fund being made up from "money derived from sale of clothing, shoes, garbage, and sources of that kind." The "posthumous fund" was "made up largely of money that was on deposit belonging to pensioners at the time of their death." As a rule no receipts were given to

inmates for their pensions which were taken, and no report of the same was ever made by the board to any higher authority. We think, although the pension money of inmates was more or less mingled in these various funds, it is quite clearly shown that at the time the law in question was passed the excess pension money which had been collected was little, if any, of it in the "post fund" or "posthumous fund." No report of the excess pension fund was ever made to the State or legislature until some time after this suit was begun, when in 1911 the treasurer of the home, on request, reported that he had the adjutant go back as far as possible in order to satisfy the joint committee, and he accordingly reported a detailed statement of excess pensions taken from members of the home from 1897 to 1911, and there was then on hand "of this pension money, $7,980.15, having kept the same separately, that it is available for distribution and refunding if the legislature in their wisdom so desire to do." Subsequently, without any further authority or direction so far as shown, "the home pension fund" was turned into the "post fund." We are unable to find that the legislation referred to, or the subsequent transferring by the board of this money to the post fund, affects the legal status of defendants as trustees of this money.

Neither can the claim prevail that this suit cannot be maintained because it is against the State, which cannot be sued by a private individual. Defendants are not the State. They had not reported or accounted to the State for this money when this suit was begun. They had lawfully received it as a police regulation, and were holding it in trust for the owners. They only claim a right to convert it to the uses of an institution of the State, of which they are the managers. Indirectly and rather remotely, it can be admitted, the State may be interested in the result, and its legal rep-

resentative is entitled to be and has been heard; but defendants' claim of right as State officers to use this money for a State institution does not make this a suit against the State. Its purpose is not to take money from the State treasury, or to seize or interfere with State property.

For various reasons, not necessary to detail at length here, no excess pension money of inmates has been permanently appropriated since July, 1908, and the present management makes no claim of right to do so. This case only involves the right of those managing the home before that time to exercise such right. Act No. 102 of the Public Acts of 1911 made yet more clear the proper course to be pursued by requiring receipts to be given inmates for any of their property, including pensions, coming into the custody of the board, except fines, and providing that the same could only be so taken for the purpose of discipline, to be held in trust for the "purpose of paying or turning the same over to said resident at the time of his discharge from the Michigan soldiers' home, and accounting for the same to the heirs or legal representatives of said residents after death."

We conclude it is in harmony with the intent of the statute and purport of the decision in *Loser* v. *Board of Managers, supra,* that these excess pension moneys under consideration, now in possession of defendants, or which should be, the amounts of which are conceded, must be decreed to be held in trust, and accounted for according to the provisions of said Act No. 102. The amounts due to discharged or deceased soldiers, in relation to whom the trust has terminated, should be paid, with interest computed at 5 per cent. per annum from the time of death or discharge. The money of those yet inmates can only be retained and held under control according to rules and regulations of the board promulgated for the purpose of dis-

cipline. Interest cannot be exacted from the board for money so held in trust under an authorized rule, while the pensioner is an inmate, unless it be shown that while so holding the board received interest, in which case it should account for the same.

With these modifications, the decree is affirmed, with costs.

McALVAY, C. J., and BROOKE, STONE, OSTRANDER, and MOORE, JJ., concurred. KUHN and BIRD, JJ., did not sit.