TRYC v MICHIGAN VETERANS' FACILITY

Docket No. 100085. Argued November 9, 1995 (Calendar No. 12). Decided April 3, 1996.

Catherine Tryc, for herself, and as personal representative of the estate of Richard Tryc, deceased, brought an action in the Court of Claims against the Michigan Veterans' Facility and the Department of Public Health, alleging negligence by the facility's employees. Mr. Tryc, who suffered from Alzheimer's disease, while a resident of the facility, had been left unattended while wearing a restraint to secure him to his chair, and had strangled when he slipped down in the chair. The court, Peter D. Houk, J., granted summary disposition for the defendants on the basis of governmental immunity, finding that the facility was not a hospital for purposes of the public hospital exception, MCL 691.1407(4); MSA 3.996(107)(4), and that the nature of the facility approximates that of a nursing home. The Court of Appeals, NEFF, P.J., and MURPHY and M. R. STEMPIEN, JJ., affirmed in an unpublished memorandum opinion (Docket No. 145189). The plaintiff appeals.

In an opinion by Justice MALLETT, joined by Justices LEVIN, CAVANAGH, and BOYLE, the Supreme Court held:

The Michigan Veterans' Facility is a hospital within the meaning of the hospital exception of the governmental immunity statute, thus preventing it from claiming immunity from the negligent acts of its employees.

1. The hospital exception of the governmental immunity statute clearly states that a hospital is any facility that offers overnight care and services for observation, diagnosis, and active treatment of an individual with a medical, surgical, obstetric, chronic, or rehabilitative condition requiring the daily direction or supervision of a physician. If a facility offers the requisite care to one individual, who does not need to be the individual bringing suit, the facility meets the definition. The touchstone of the exception is the type of care offered to and required by an individual, not the general character of the facility. When a long-term care facility offers the type of care required by the statutory definition of hospital, it and its agents and employees are not immune from suit.

2. The statute only requires daily physician direction or supervision. Each time a nurse administers medication daily under the direction of a physician, a physician directs the daily administration of a medication, or a policy requires that a given order be renewed daily by a physician, the criteria clearly are satisfied. Because at least some of the residents of the facility in this case have chronic or rehabilitative conditions requiring active treatment under the daily direction or supervision of a physician, and the facility offers such care, it is a hospital within the meaning of the hospital exception to governmental immunity.

Reversed and remanded.

Justice RILEY, joined by Chief Justice BRICKLEY and Justice WEAVER, dissenting, stated that a narrow construction of the public hospital exception to the governmental immunity statute compels the conclusion that the Michigan Veterans' Facility is not a hospital. The facility does not provide active treatment of conditions requiring the daily direction or supervision of a physician. Thus, it is protected by governmental immunity because the public hospital exception does not apply.

MCL 691.1407(4)(b); MSA 3.996(107)(4)(b) provides that a hospital must offer services for conditions that require the daily direction or supervision of a physician. The term "daily" modifies the kind of direction or supervision that the physician must provide, not the kind of care that the facility's nursing staff must provide while under the supervision of a physician. The physician must daily direct or supervise a patient's treatment. This level of care is met when the physician either examines the patient on a daily basis or directs the medical staff on a daily basis to take some action regarding the patient's medical care. The fact that nurses provide daily medical care while under the general direction or supervision of a physician cannot satisfy this definition.

Under the undisputed facts of this case, the public hospital exception is unambiguous. Its definition of hospital does not include the Michigan Veterans' Facility because the facility does not offer services for residents with conditions that require daily physician supervision or direction. Even if the statute were ambiguous about what constitutes "daily" physician supervision or direction, this interpretation is supported by the principles of statutory construction and by the uncontroverted sworn statements on the record. Moreover, it also confirms the common-sense conclusion that the Michigan Veterans' Facility, in ordinary terms, would be called a nursing home, not a hospital. A hospital treats patients with acute medical needs by providing active treatment for patients with conditions requiring daily physician direction or supervision.

In contrast, a nursing home addresses the long-term medical needs of individuals subject to prolonged suffering or who are recovering from an illness or injury by providing a program of planned and continuing medical care under the charge of physicians. In this case, the facility performs the same function as a nursing home. It is not a hospital under the Public Health Code and, therefore, is not a hospital under the public hospital exception.

*Schenk, Boncher & Prasher* (by *Gregory G. Prasher, Gary Schenk,* and *Curtis D. Rypma*) for the plaintiff.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Thomas R. Wheeker,* Assistant Attorney General, for the defendant.

MALLETT, J. The question presented in this appeal is whether the Michigan Veterans' Facility meets the hospital exception of the governmental immunity statute, thus preventing the facility from claiming immunity from the negligent acts of its employees. Because the facility meets the four-part definition of "hospital" according to the plain language of the statute, we reverse the decision of the Court of Appeals.

I

On November 8, 1989, Richard Tryc was admitted to the Michigan Veterans' Facility in Grand Rapids, a residential facility designed to provide care for veterans. Tryc was a veteran of the Second World War who suffered from Alzheimer's disease. At the time of his admission, the facility was under the administration of the Department of Public Health.[1]

---

[1] The administration of the facility was transferred to the Department of Military Affairs pursuant to Executive Order No. 1991-6, effective January 17, 1991, as amended by Executive Order No. 1992-1.

After his admission to the facility, a long-term care assessment was prepared for Tryc. This assessment indicated that the facility staff could place Tryc in a geriatric chair to keep him in place during meals and when he became "agitated." On March 10, 1990, Tryc was fed his breakfast in the geriatric chair while wearing a "protective vest," which was a restraint that wrapped around him and secured him to the chair. After breakfast, at approximately 8:40 A.M., he was left unattended while the workers assigned to care for him were hearing morning reports and taking a coffee break. During this time, Tryc slipped down in the chair and was strangled to death by the vest.[2]

A tort action was filed by Catherine Tryc, Richard's wife, individually and as personal representative of his estate, against the facility and the Department of Public Health, seeking recovery on the basis of the alleged negligence of the facility's employees. Defendants moved for summary disposition pursuant to MCR 2.116(C)(7),[3] claiming that they were immune from suit on the basis of governmental immunity. The Court of Claims granted summary disposition for defendants, concluding that the facility was not a "hospital" for purposes of the public

---

[2] An investigator hired by the facility to review the events preceding Tryc's death produced a report that concluded:

I find the evidence indicates Ms. Gould [Tryc's care worker] placed Mr. Tryc in the Day room while being left in his protective Vest for a prolonged period of time, over 30 minutes without being monitored by Staff, and was placed there not because she knew he could not walk due to his unsteadiness but because it was more convenient to her to be able to locate and finish dressing him after her reports and coffee break. It was "routine" for her to do this rather than allow Mr. Tryc to wander or for her to "test" his unsteadiness. It indicates the Vest was used as a Physical Restraint rather than a Protective Device.

[3] Defendants mistakenly state on appeal that they sought summary disposition pursuant to MCR 2.116(C)(10).

hospital exception, MCL 691.1407(4); MSA
3.996(107)(4). It noted that the facility was "not a
licensed hospital," did not have an organized medical
staff, was not accredited by the "Joint Committee on
Hospital Accreditations," and did not have a peer-review
committee. It stated that "the nature of the facility much
more closely [ap]proximates that of a nursing home"
even though it was not a nursing home because it was
"exempted from the nursing home statute."

Plaintiff appealed the Court of Claims decision in the
Court of Appeals, which affirmed in an unpublished
memorandum opinion, issued June 10, 1994 (Docket
No. 145189). Plaintiff sought leave to appeal to this
Court, which was granted, limited to the issue "whether
the Michigan Veterans' Facility is a 'hospital' within the
statutory definition found in MCL 691.1407(4)(b); MSA
3.996(107)(4)(b).[4] We reverse the decision of the Court
of Appeals that the facility was not a "hospital" under
the public hospital exception.

II

Defendants asked the Court of Claims for summary
disposition pursuant to MCR 2.116(C)(7),[5] claiming that
they were protected by governmental immunity. In
determining whether a plaintiff's claim is barred by
immunity granted by law under MCR 2.116(C)(7), a
court must consider all documentary evidence filed or
submitted by the parties. *Wade v Dep't of Corrections,*

---

[4] 449 Mich 852 (1995).

[5] MCR 2.116(C)(7) provides:

The claim is barred because of release, payment, prior judgment,
immunity granted by law, statute of limitations, statute of frauds,
an agreement to arbitrate, infancy or other disability of the moving
party, or assignment or other disposition of the claim before com-
mencement of the action.

439 Mich 158, 162; 483 NW2d 26 (1992). The court accepts well-pleaded allegations as true and construes them in a light most favorable to the nonmoving party. *Id.* at 162-163. Governmental immunity under MCL 691.1401 *et seq.*; MSA 3.996(101) *et seq.* is an affirmative defense and must be stated in a defendant's responsive pleading, MCR 2.111(F)(3)(a). *Id.* at 163; *McCummings v Hurley Medical Center*, 433 Mich 404, 412; 446 NW2d 114 (1989). However, the plaintiff must allege facts justifying application of an exception to governmental immunity in order to survive a motion for summary disposition. *Wade, supra* at 163.

The State of Michigan provides under MCL 691.1407(1); MSA 3.996(107)(1) that governmental agencies are immune from tort liability when engaged in the exercise or discharge of a governmental function. This statute provides for broad immunity. *Wade, supra* at 166; *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567, 595; 363 NW2d 641 (1984).

In 1986 PA 175, the Legislature, in response to our ruling in *Ross, supra,* amended the governmental immunity statute by creating the public hospital exception. *Hyde v Univ of Michigan Bd of Regents*, 426 Mich 223, 245; 393 NW2d 847 (1986). In *Ross, supra* at 620, we defined the meaning of "governmental function" to be an "activity which is expressly or impliedly mandated or authorized by constitution, statute, or other law." Under *Ross,* a public general hospital would be protected from liability whenever its activities were expressly or impliedly mandated by law. See *Hyde, supra* at 243. This decision impliedly overruled *Parker v Highland Park*, 404 Mich 183; 273 NW2d 413 (1978), which had held that a public hospital was subject to liability because its operation did not constitute the exercise of a governmental function. See *Hyde, supra* at 243. Act 175 adopted the principle from *Parker* that a governmental

agency operating a general hospital was subject to tort liability. *Stein v Southeastern Michigan Family Planning Project, Inc,* 432 Mich 198, 203; 438 NW2d 76 (1989).

The hospital exception of the governmental immunity statute provides that a facility and its agents and employees are not immune under the statute if the facility meets the following four-part definition of "hospital": (1) it offers inpatient, overnight care and services; (2) for observation, diagnosis and active treatment; (3) of an individual with a medical, surgical, obstetric, chronic, or rehabilitative condition; (4) requiring the daily direction or supervision of a physician.[6]

The rules of statutory construction are well established. First and foremost, we must give effect to the Legislature's intent. *Reardon v Mental Health Dep't,* 430 Mich 398, 407; 424 NW2d 248 (1988). If the language of a statute is clear and unambiguous, the plain meaning of the statute reflects the legislative intent and judicial construction is not permitted. *Turner v Auto Club Ins Ass'n,* 448 Mich 22, 27; 528 NW2d 681 (1995). Further, we are to give statutory language its ordinary and gener-

---

[6] The statute provides in pertinent part:

> (4) This act does not grant immunity to a governmental agency with respect to the ownership or operation of a hospital or county medical care facility or to the agents or employees of such hospital or county medical care facility. As used in this subsection:

> *    *    *

> (b) "Hospital" means a facility offering inpatient, overnight care, and services for observation, diagnosis, and active treatment of an individual with a medical, surgical, obstetric, chronic, or rehabilitative condition requiring the daily direction or supervision of a physician. The term does not include a hospital owned or operated by the department of mental health or a hospital operated by the department of corrections. [MCL 691.1407(4)(b); MSA 3.996(107)(4)(b).]

ally accepted meaning. *Id.* at 27. However, when a statute specifically defines a given term, that definition alone controls. *Detroit v Muzzin & Vincenti, Inc*, 74 Mich App 634, 639; 254 NW2d 599 (1977); *Butterfield Theatres v Revenue Dep't*, 353 Mich 345; 91 NW2d 269 (1958).

Applying these principles, the definition of "hospital" supplied in the statute, being clear and unambiguous, controls. Judicial construction is not permitted.[7]

---

[7] Thus, the dissent's inquiry into whether the facility better fits the commonly understood definition of a nursing home, rather than a hospital, or whether it fits the definition of a nursing home as provided in the Public Health Code is inappropriate. Even if the statute were ambiguous, the dissent's reliance on the Public Health Code is unpersuasive. The dissent examines the mutually exclusive definitions of "hospital" and "nursing home" under the Public Health Code and determines that the facility's general character is that of a nursing home, not a hospital. However, it does not matter if the facility's general character is more akin to a nursing home or long-term care facility. The definition of "hospital" provided in the governmental immunity statute specifically includes facilities that treat chronic or rehabilitative conditions. Nor does it matter that the facility has the equivalent of only two full-time physicians. The definition does not mandate a specific physician-patient ratio. The definition provides that a "facility" is a "hospital" if it offers services for active treatment of an individual with a condition requiring the daily direction or supervision of a physician. Even if the facility does not maintain an appropriate physician-patient ratio, if it offers such treatment to an individual requiring such physician direction and supervision, it is a hospital within the meaning of the definition.

Unlike the Public Health Code, the governmental immunity statute does not define "hospital" as being an entity mutually exclusive of a nursing home. Further, the purpose of providing mutually exclusive definitions for nursing homes and hospitals under the Public Health Code are not relevant to the purpose of defining "hospital" under the governmental immunity statute. The Public Health Code establishes a comprehensive licensing and regulatory scheme that necessarily distinguishes between the two types of entities. In contrast, the purpose of the hospital exception to governmental immunity is to allow suits against government-operated facilities that offer to provide a certain level of care. In enacting the hospital exception, the Legislature has chosen to correct inequitable recoveries between persons injured by identical conduct in public and private facilities. *Jamieson v Luce-Mackinac-Alger-Schoolcraft Dist Health Dep't*, 198 Mich App 103, 112; 497 NW2d 551 (1993).

The clear language of the statute states that a "hospital" is any facility that offers overnight care and services for observation, diagnosis, and active treatment of *an individual* with a medical, surgical, obstetric, *chronic, or rehabilitative condition requiring the daily direction or supervision of a physician.* Thus, if a facility offers the requisite care to *one* individual, who does not need to be the individual bringing suit, the facility meets the definition.

The touchstone of the exception is the type of care offered to and required by an individual, not the general character of the facility.[8] When a long-term care facility offers the type of care required by the statutory definition of "hospital," it is not immune from suit.

The dissent suggests that to meet the requirement of daily physician direction or supervision, every resident must be seen by a physician each and every day of a stay at the facility.[9] If this were the intent, the Legislature could have explicitly required daily physician visits or that care be administered directly by a physician daily throughout the patient's entire stay. Instead, the statute only requires daily physician *direction or super-*

---

[8] It should be noted that in today's health care world, the lines between acute care hospitals and nursing homes have become increasingly blurred. Patients are often discharged from hospitals when their conditions still require active treatment under the daily direction or supervision of a physician. These patients are frequently transferred from a hospital to a nursing home or long-term care facility for a period to receive this care.

[9] If the dissent's suggestion were taken literally, many hospitals would fail to meet the definition. For example, I would find it surprising if all patients in a rehabilitation hospital are seen by a physician on a daily basis. Also, common experience tells us that patients in general acute care hospitals do not always receive care directly from a physician each and every day of their stay. During more lengthy hospital stays the physician may merely review the chart and may not actually visit the patient daily.

*vision.*[10] Each time a nurse administers medication, it is done under the direction of a physician. A physician's order directing the daily administration of a medication, or a policy requiring that a given order be renewed daily by a physician, clearly satisfies the criteria.

III

The first three elements of a "hospital" under the statute are for the most part undisputed; the facility offers inpatient, overnight care for observation, diagnosis, and treatment of individuals with medical, chronic, or rehabilitative conditions. Defendants dispute whether the facility offers *active* treatment for conditions *requiring the daily direction or supervision of a physician.* However, we find that the evidence indicates otherwise.

In this regard, the deposition testimony of Thomas Lindsay, the commandant of the facility, is instructive. Mr. Lindsay would not acknowledge that the facility was a "hospital," insisting instead that it was a long-term care facility.[11] However, when questioned specifically on the four elements of a "hospital" under the statute, he testified that the facility does provide overnight, inpatient care and active daily treatment of chronic and rehabilitative conditions. He further testified that the

---

[10] *The Random House Dictionary of the English Language: Unabridged Edition,* provides the following definitions of the terms "direction" and "supervision":

   Direction—Order; command. . . . management; control; guidance; supervision. . . .
   Supervision—The act or function of supervising; superintendence.

[11] Mr Lindsay's insistence that active care and daily physician supervision or direction are provided at the facility only in the context of long-term care and only for some of the residents is irrelevant to the statutory inquiry. As previously noted, the statute does not require that the services be provided in an acute care setting or that they be provided to all the residents.

facility has a full-time staff physician who provides daily direction and supervision for residents' medical care. Mr. Lindsay's testimony was as follows:

*Q.* Well, let's go through it step by step, how about that?

*A.* Okay.

*Q.* First of all, the Veteran's Facility does offer in-patient care, doesn't it?

*A.* In-patient from the standpoint of overnight services for more than one night, yes.

*Q.* And it also offers its people, its veteran residents, overnight care?

*A.* That's by virtue of being a long term care facility.

*Q.* It offers them long term care and services?

*A.* Yes.

*Q.* And among the services that are offered by the Veteran's Facility are services that include things like observation of their condition from time to time?

*A.* Yes.

*Q.* Diagnosis of what their condition is?

*A.* Yes.

*Q.* And active treatment of those conditions?

*A.* Active treatment in terms of that long term care setting, what we are providing is typically maintenance treatment for a long term illness.

*Q.* But it's nevertheless active treatment. I'm not talking about active treatment of the entire panoply of medical problems that a general hospital might provide. I mean certainly among the things that you actively treat your veteran residents for are chronic problems, you treat them on an active basis on a daily basis?

*A.* Right.

*Q.* And you also treat your veteran residents on an active and daily basis for rehabilitative problems?

*A.* Not all of the veterans.

*Q.* Not all of them, but some of them?

*A.* Some of them, yes.

\*     \*     \*

*Q.* Well, you do have on-staff physicians?

*A.* We have on-staff physicians, yes.

*Q.* And you have at least what, two of them?

*A.* I have one on-staff physician.

\*          \*          \*

*Q.* That physician is full-time?

*A.* Yes.

*Q.* And provides the residents of the facility with daily direction or supervision?

*A.* Not all of the residents.

*Q.* But some of them?

*A.* Some of the residents on a particular rotation.

In addition to Mr. Lindsay's testimony, brochures from the facility that emphasize the medical care available to residents also indicate that the hospital exception applies. For example, a pamphlet titled "Member Guide Book" states:

> The Joseph W. Mann Building was built in 1988 and provides skilled nursing care for 226 residents. *An organized program of medical care is available on an ongoing basis, designed to meet individual needs. This building is staffed with doctors, nurses, and residential care personnel who provide for the medical needs of the members.*
>
> \*          \*          \*
>
> The Bernie C. McLeish Building was built in 1975. This 343-bed unit provides both skilled and basic nursing care. *Again, doctors, nurses, and residential care personnel provide for the medical needs of the members.* Business offices, the kitchen, the main dining facility, *doctors' and dentists' offices, clinics, x-ray, medical laboratory, occupational and physical therapy,* the chapel and chaplain offices are also located in this building. [Emphasis added.]

Also, from a booklet titled "Michigan Veterans' Facility, A Century of Caring":

> The *primary objective of care at the MVF is to restore health* and maintain existing functions, enabling veterans the opportunity to enjoy their remaining years to the fullest. [Emphasis added.]

These publications describe active treatment rather than passive or strictly maintenance services. For example, they indicate the availability of physical and occupational therapy. In addition, the listed objectives of care include restoring health, not merely maintaining it. The publications also suggest the availability of daily medical care by staff physicians. The reference to an "organized program of medical care . . . available on an ongoing basis . . . to meet individual needs," suggests that physicians are available to provide daily direction or supervision for the residents' medical care when such care is needed.

The facility's written policies and procedures, dated January 18, 1989, for physical restraints, like the safety vest worn by Mr. Tryc, is also highly indicative of daily physician direction or supervision. The procedures state that physical restraints may only be ordered "from the physician and must be renewed every 24 hours." Thus, under these procedures, the staff physician was required to reevaluate daily the need for such devices and to reorder them daily.[12]

---

[12] The dissent, *post* at 152-153, points out that a newer policy replaced the daily order requirement, and that at the time of Mr. Tryc's death, restraints were to be ordered on a monthly basis. This, however, would not be dispositive because daily orders may be the appropriate standard. This facility should no more be permitted to establish its own standards than any other defendant. The question whether physical restraints or safety vests should be ordered daily or monthly is for a jury to decide.

Finally, Mr. Tryc's medical records also support application of the hospital exception by confirming daily physician direction or supervision in Mr. Tryc's care. For example, the medical records reveal that the staff physician performed a complete history and physical examination of Mr. Tryc, ordered various laboratory studies and x-rays, reviewed the laboratory studies and x-rays, prepared a long-term care assessment and treatment plan, and ordered numerous medications and devices. Prescription order forms were signed by the staff physician on a regular basis. These included orders for medications and devices that were to be administered to Mr. Tryc daily. In sum, Mr. Tryc's medical records reflect ongoing and detailed physician direction and supervision in his care which, when viewed with all the other evidence, establish active treatment under the daily direction or supervision by a physician.

IV

The evidence, consisting of: (1) Mr. Lindsay's deposition testimony, in which he admits that the facility provides services satisfying the four elements enumerated in the statutory definition of "hospital," (2) facility publications describing active and ongoing medical treatment and services available for residents, (3) the facility's policy and procedures regarding the use of physical restraints, and (4) Mr. Tryc's own medical records from the facility, establish that the hospital exception is met. The dissent's suggestion that to meet the exception, the general character of the facility must be akin to an acute-care hospital is not required by the statute. Nor does the statute require that patients in a facility be seen each day throughout their stay by a physician; it merely dictates that at least some of the patients have

conditions requiring active treatment under the daily *direction or supervision* of a physician. Because at least some of the residents of the Michigan Veterans' Facility have chronic or rehabilitative conditions requiring active treatment under the daily direction or supervision of a physician, we hold that the facility is a hospital within the meaning of the hospital exception to governmental immunity and remand for trial.

Reversed and remanded.

LEVIN, CAVANAGH, and BOYLE, JJ., concurred with MALLETT, J.

RILEY, J. I respectfully dissent. I believe that a narrow construction of the public hospital exception to the governmental immunity statute compels the conclusion that the Michigan Veterans' Facility is not a "hospital." The facility does not provide "active treatment" of conditions "requiring the *daily* direction or supervision of a physician." (Emphasis added.)[1] For this reason, I conclude that the facility is protected by governmental immunity because the public hospital exception does not apply. I would affirm the decision of the Court of Appeals.

I

The Michigan Veterans' Facility was established by statute in 1885, MCL 36.1 *et seq.*; MSA 4.871 *et seq.*, for members of the armed forces "who are disabled by disease, wounds, or otherwise, and who have no adequate means of support, and by reason of their disability are incapable of earning their living and who would be otherwise dependent upon public or private charity . . . ." MCL 36.11(1); MSA 4.878(1). In *Mason v Bd of Manag-*

---

[1] MCL 691.1407(4)(b); MSA 3.996(107)(4)(b).

*ers of Michigan Soldiers' Home,* 181 Mich 347, 353; 148
NW 220 (1914), citing *Wolcott v Holcomb,* 97 Mich 361;
56 NW 837 (1893), this Court explained the reason for
the foundation of this facility:

> [The] object [of the act] was to furnish a home, which
> would be a more congenial and fitting refuge than the ordi-
> nary charitable institution, to that class of honorably dis-
> charged veterans who, disabled by disease, wounds, or oth-
> erwise from earning their living, and having no adequate
> means of support, would otherwise become objects of com-
> mon charity.

The State of Michigan provides that governmental
agencies are immune from tort liability when engaged
in the exercise or discharge of a governmental func-
tion. MCL 691.1407(1); MSA 3.996(107)(1). This stat-
ute provides for broad immunity. *Wade v Dep't of Cor-
rections,* 439 Mich 158, 166; 483 NW2d 26 (1992);
*Ross v Consumers Power Co (On Rehearing),* 420
Mich 567, 595; 363 NW2d 641 (1984). However, the
statute provides a public hospital exception to this
rule:

> (4) *This act does not grant immunity to a governmental
> agency with respect to the ownership or operation of a hos-
> pital* or county medical care facility or to the agents or
> employees of such hospital or county medical care facility.
> As used in this subsection:

> \*        \*        \*

> (b) *"Hospital" means a facility offering inpatient, over-
> night care, and services for observation, diagnosis, and
> active treatment of an individual with a medical, surgi-
> cal, obstetric, chronic, or rehabilitative condition requir-
> ing the daily direction or supervision of a physician.* The
> term does not include a hospital owned or operated by the
> department of mental health or a hospital operated by the

department of corrections. [MCL 691.1407(4)(b);     MSA
3.996(107)(4)(b)   (emphasis added).]

Exceptions to governmental immunity are to be *narrowly* construed. *Wade, supra* at 166, citing *Hyde v Univ of Michigan Bd of Regents*, 426 Mich 223, 245; 393 NW2d 847 (1986).

The appeal in this case is limited to determining whether the facility is a "hospital" within the definition provided by MCL 691.1407(4)(b);     MSA 3.996(107)(4)(b).   Under MCR 2.116(C)(7),  the Court of Claims was required to examine the pleadings, affidavits, depositions, and other documentary evidence in answering this question. There was no factual dispute about the particular services the facility provided or about Richard Tryc's medical record. Thus, whether the facility was a "hospital" under the statute did not require a factual finding and, as a matter of pure statutory interpretation, was a question of law subject to de novo review. *Cardinal Mooney High School v Michigan High School Athletic Ass'n*, 437 Mich 75, 80; 467 NW2d 21 (1991).   Consequently, it was a legal matter for the trial court to decide.

II

A

In interpreting the public hospital exception, the majority concludes that the facility would meet the definition of a "hospital" under the statute even if it merely offered medical services to residents on a daily basis:

> [T]he statute only requires daily physician direction or supervision. [Footnote defining the terms "direction" and "supervision" omitted.] Each time a nurse administers medication, it is done under the direction of a physician. *A phy-*

*sician's order directing the daily administration of a med-
ication,* or a policy requiring that a given order be renewed
daily by a physician,[2] clearly satisfies the criteria. [*Ante,* pp
137-138 (emphasis added).]

Such an interpretation eliminates the significance of
the term "daily" from the statute. This Court is bound
to read the statute narrowly. *Wade, supra* at 166. The
Court must also read the statute to ensure that every
word has meaning and to avoid rendering any word
nugatory. *Altman v Meridian,* 439 Mich 623, 635; 487
NW2d 155 (1992). The statute provides that a "hospi-
tal" offer services for conditions that "requir[e] the
*daily* direction or supervision of a physician." MCL
691.1407(4)(b);    MSA  3.996(107)(4)(b)    (emphasis
added). The term "daily" in the statute modifies the
kind of direction or supervision that *the physician
must provide,* not the kind of care that the facility's
nursing staff must provide while under the supervi-
sion of a physician. The physician must *daily* direct
or supervise a patient's treatment. I think this level of
care is met when the physician either examines the
patient on a daily basis or directs the medical staff on
a daily basis to take some action regarding the
patient's medical care. The fact that nurses provide
daily medical care while under the *general* direction
or supervision of a physician cannot satisfy this defi-
nition. Under the majority's interpretation of the stat-
ute, the facility would meet the definition of a "hospi-
tal" under the public hospital exception if it offers
daily medical services for conditions that only require

---

[2] I address the majority's reference to a policy requiring that an order
be renewed daily in part II(C).

the general direction or supervision of a physician. This totally changes the meaning of the statute.

There is no dispute that at the time of Tryc's death the facility only maintained a single, full-time, on-staff physician for the entire facility. The facility also had a contract with Metropolitan Hospital in Grand Rapids, which provided six other physicians who rotated through the facility. This rotation created the equivalent of two full-time physicians for the facility except for weekends and evenings. The facility's three residential buildings had "accommodations for 763 members . . . ."[3] Although the record does not indicate how many veterans were receiving care in the three residential buildings at the time of Tryc's death in March 1990, there were 690 veterans at the facility in August 1991. If this were a "hospital" as defined by the statute, there would be only the equivalent of two physicians to provide daily direction or supervision for the observation, diagnosis, and active treatment for almost seven hundred veterans.

The majority concludes that "[t]he touchstone of the exception is the type of care offered to and required by an individual, not the general character of the facility." *Ante*, p 137. Even conceding this point, there is no evidence to support the claim that on a daily basis the facility's physician, Dr. Winifred Eshragh, directed or supervised Richard Tryc's treatment or the treatment of any other resident at the facility. In particular, using the ordinary meaning of

---

[3] The facility's "Member Guide Book," pp 5-6, explained that the Joseph W. Mann Building provides "skilled nursing care for 226 residents," the McLeish Building contains 343 beds with "skilled and basic nursing care," and the Rankin Building has 140 "domiciliary beds" and fifty-four "basic nursing care beds" for members who "demonstrate a higher degree of self-care ability . . . ."

the statute's terms, Dr. Eshragh did not provide direction or supervision for Tryc's medical care *every day* for four months merely because she had assessed his medical needs after he was admitted and instructed the nurses on that day to provide him daily medical care in accordance with the long-term care assessment.

B

In examining a similar question before this Court, the Court of Appeals in *Winklepleck v Michigan Veterans' Facility*, 195 Mich App 523, 535; 491 NW2d 251 (1992), held that the plaintiff did not create a genuine issue of material fact about whether the Michigan Veterans' Facility in Grand Rapids was a hospital under the public hospital exception. The plaintiff, Eva Winklepleck, sued the facility for negligence after Kenneth Winklepleck died in an accident at the facility. Kenneth Winklepleck, a veteran, suffered from multiple sclerosis and was a resident receiving care at the facility when he was dropped from his bed while being moved by an hydraulic device.

The Court of Appeals concluded that the Court of Claims erred by resolving the issue "as a matter of fact and law" about whether the facility was a hospital because the Court of Claims "should have confined itself to deciding whether defendants' motion was properly supported" in that case under MCR 2.116(C)(10). The Court concluded that its "review of the record indicates that [Winklepleck's] proffered evidence does not raise a genuine issue of material fact with regard to this question." *Id.* at 534. However, whether the facility is a hospital under the public hospital exception is a legal question for the trial court to resolve even though it must examine documentary evidence. The Court in *Winklepleck* wrongly suggested that if Winklepleck had pro-

duced more compelling evidence that the facility was a hospital, this would have created a genuine issue of material fact requiring the jury to make a factual finding regarding whether the facility fit the statutory definition. Yet, the application of this statute only requires statutory interpretation and is not a matter for the jury.

Nevertheless, I believe that the Court in *Winklepleck* reached the proper result. The Court noted that the medical services provided by the facility, as identified in the Member Guide Book, were "not inconsistent" with the services provided in a nursing home as defined by statute. *Id.* at 535. The Court persuasively argued this point:

> It is one thing to have physicians available or on call on a daily basis for the benefit of those who periodically need the attention of a physician (as is the case in a nursing home). It is quite another thing to offer care to those whose conditions require the daily direction or supervision of a physician. Furthermore, that the activities of nurses might be under daily supervision of physicians is not controlling. *Under the statute, it is the patients' conditions that must require daily supervision of a physician before a facility meets the test of being a hospital.* [*Id.* at 535 (emphasis added).]

I agree with this reasoning.

C

On the basis of its interpretation of the meaning of "hospital" under the public hospital exception, the majority concludes that the evidence on the record indicates that the facility offers services to residents with conditions that require the daily direction of supervision of a physician. *Ante*, p 138. I disagree. In reviewing the same evidence, I believe it only confirms that the facility was not a "hospital" under the statute.

The majority contends from the depositional testimony of Thomas Lindsay, the commandant of the facility, that he admitted that the facility provided active daily treatment of chronic and rehabilitative conditions and that the full-time physician provided daily direction for the medical care of the residents. *Ante,* pp 138-139. The majority quotes a section of Lindsay's testimony in which he noted that the facility provides daily active treatment for residents who suffer from chronic and rehabilitative problems. *Id.,* pp 139-140. However, Lindsay only testified that the facility, or in other words, the nursing staff, cared for the residents on a daily basis. This testimony does not support the claim that *Dr. Eshragh* examined these patients on a daily basis, or that *Dr. Eshragh* directed or supervised daily the facility's staff in the nursing care it provided these residents.

Lindsay did testify that the physician at the facility provided daily direction or supervision, but he said only to "[s]ome of the residents on a particular rotation." Contrary to the majority's assertion, Lindsay was not stating that Dr. Eshragh examined a certain selection of residents on a daily basis. Rather, in the context of his other testimony, there is no question that Lindsay was merely explaining that Dr. Eshragh daily examined some of the residents, not that she examined certain residents on a daily basis. There is no evidence to support the claim that Dr. Eshragh examined any facility resident on a daily basis, or that she provided daily direction or supervision to the nursing staff for the care of any particular resident. Moreover, even if Dr. Eshragh had provided daily direction for a particular resident's care, that does not mean that the resident's condition necessarily *required* this care. See *Winklepleck, supra* at 535.

The majority also relies on the facility's brochures to support its conclusion that it operated as a "hospital" under the statute. However, the Member Guide Book

clearly indicated in its introduction the kinds of services the facility provides:

> Skilled nursing care, basic nursing care, and supervised personal (domiciliary) care are all provided on th[e] campus [of the Michigan Veterans' Facility].

The list of services the facility offers as identified in the "Michigan Veterans' Facility, A Century of Caring" brochure also contradicts the conclusion that the facility provided the kind of acute care necessary to meet the statute's definition of a "hospital."[4] The only

---

[4] The brochure provided this list of the services that the facility offers:

SERVICES PROVIDED

Levels of Care:
Skilled Nursing Care—serves the individual with severe disabilities requiring continuous nursing care and supervision.
Basic Nursing Care—serves the individual with moderate disabilities.
Domiciliary Unit—serves the individual who needs very little nursing care, but has some limitations which require a structured environment.
Following a medical examination and comprehensive evaluation, the physician and professional staff of MVF are responsible for determining the level of care a veteran will require.

Services:
The Facility offers full time physician coverage as well as the following services:

- Pharmacy
- Respiratory Therapy
- Physical Therapy
- Occupational Therapy
- Rehabilitation (inpatient)
- Psychiatric aftercare
- Social work department
- Speech Therapy
- Routine Dental Examination
- Laundry

listed service that suggests that the facility cares for veterans with conditions requiring daily physician supervision is "[s]pecial [c]linics in [s]urgery [and] . . . [o]rthopedics." However, Lindsay testified in his deposition, and plaintiff does not dispute, that the facility did not offer surgery as a service. The facility sends veterans who need surgery to Metropolitan Hospital in Grand Rapids. Otherwise, the listed services are the kinds of services that a facility provides for individuals who need long-term care, not for individuals whose conditions require daily physician direction or supervision. They are not the *basic* services provided by an acute medical care facility, i.e., a hospital.

The majority also refers to the facility's written policies, suggesting that they were an indication that the facility's physician daily directed or supervised the resident's care. In support of its conclusion, the majority cites the facility's policy manual of Janu-

---

- Auxiliary
- Volunteer Services
- Pastoral care
- Laboratory services
- Vocational/disability services
- Recreation therapy
- EKG
- INH Therapy
- Special Clinics in Surgery, Genital/Urinary, Orthopedics, Colo-Rectal disease

Additional services available on a fee-for-service basis:

- Podiatry
- Dental Services (partial fee)
- Vision Services (partial fee)
- Barber
- Beautician

ary 18, 1989, which required that the use of a restraint, like the vest worn by Tryc, be renewed by a physician every twenty-four hours. *Ante*, p 141. However, this policy was replaced by a new policy, effective September 26, 1989, more than a month before Tryc was admitted. The new policy did not require that a physician renew his order every twenty-four hours but only required that he specify the "length of time [its use was] authorized."

Moreover, Dr. Eshragh never authorized the use of a physical restraint for Tryc; she only authorized the use of the vest as a "protective device" to protect him from falling out of bed and to allow the staff to feed him. The facility's policies only required that Dr. Eshragh review the vest's use as a protective device on a monthly basis. Even if used as a restraint, these policies still only required that Dr. Eshragh review its use monthly. As the Director of Clinical Programs at the facility, Barbara Winburne, explained, "[d]octors rewrite their orders every 30 days, giving the length of time for it to be in effect or length of time for [the restraint] to be on the patient." She added "[g]enerally [d]octors' orders are written every 30 days" for the use of a restraint.

Finally, the majority contends that Tryc's medical records indicate that he was under the daily supervision and direction of a physician. I disagree. After Tryc's admission to the facility he was given an initial assessment and treatment plan. The majority notes that Dr. Eshragh ordered laboratory studies, an electrocardiogram, and x-rays, and prepared a long-term care assessment. The long-term care assessment directed that Tryc receive medication, wear the protective vest in bed, and use the geriatric chair for

meals and agitation. Tryc received medication daily, and the facility staff kept daily records of his feeding and diet. The nursing staff also kept frequent interdisciplinary progress reports regarding his condition. However, there were only seven physician progress notes in his file during the approximately four months Tryc resided at the facility before his death. At one point, more than two months elapsed between physician progress notes: Dr. Eshragh entered the fourth note on November 25, 1989, and the fifth progress note on February 13, 1990. Of the sixteen medication orders[5] written by a physician during these four months, ten were issued within the first three weeks of Tryc's admission. Only six were written over the next three months. Thus, the record demonstrates that Tryc's condition did not *require daily* direction or supervision of a *physician*.

### III

### A

I believe that, under the undisputed facts of this case, the public hospital exception is unambiguous. Its definition of "hospital" does not include the Michigan Veterans' Facility because the facility does not offer services for residents with conditions that required daily physician supervision or direction. Even if the statute were ambiguous about what constitutes "daily" physician supervision or direction, the interpretation that I urge is supported by the principles of statutory construction and by the uncontroverted sworn statements on the record. Moreover, this interpretation also confirms the

---

[5] Several of these orders did not involve medication, but instead ordered the use of safety equipment or authorized the staff to place Tryc in the "quiet room" when he was belligerent.

common-sense conclusion that the Michigan Veterans' Facility would be, in ordinary terms, called a nursing home, not a hospital.

The 1986 amendment creating the public hospital exception to the governmental immunity statute used virtually identical language to define "hospital" as the Public Health Code in MCL 333.20106(5); MSA 14.15(20106)(5).[6] The Public Health Code, enacted in 1978, governs health facilities including nursing homes and hospitals. The Legislature is held to be aware of the existence of the law in effect at the time of its enactment. *Malcolm v East Detroit*, 437 Mich 132, 139; 468 NW2d 479 (1991). Moreover, this Court has explained: "It is fundamental that adoption of language requires adoption of construction. Identical language should certainly receive identical construction when found in the same act." *People ex rel Simmons v Munising Twp*, 213 Mich 629, 633; 182 NW 118 (1921). Of course, the governmental immunity act is a different act from the Public Health Code. Nevertheless, the same words used in different statutes on the same subject generally will have the same meaning. If the statutes relate to different subjects, they may not have the same meaning. 73 Am

---

[6] MCL 333.20106(5); MSA 14.15(20106)(5) of the Public Health Code provides in pertinent part:

> "Hospital" means a facility offering inpatient, overnight care, and services for observation, diagnosis, and active treatment of an individual with a medical, surgical, obstetric, chronic, or rehabilitative condition requiring the daily direction or supervision of a physician.

The Public Health Code further states that "[t]he term does not include a hospital licensed or operated by the department of mental health." The governmental immunity statute definition instead states, "[t]he term does not include a hospital owned or operated by the department of mental health or a hospital operated by the department of corrections." MCL 691.1407(4)(b); MSA 3.996(107)(4)(b).

Jur 2d, Statutes, § 233, p 416. Here, the acts do have different purposes. Even so, by importing the identical,[7] complex, thirty-seven word definition of "hospital" from the Public Health Code, the Legislature likely intended to define "hospital" with the same meaning in the governmental immunity statute as in the code.

The Public Health Code provides a definition of a nursing home under MCL 333.20109(1); MSA 14.15(20109)(1) that would accurately define the kind of care the facility provides, except that the code specifically excludes the facility from the definition:

> *"Nursing home" means a nursing care facility, including a county medical care facility, but excluding a hospital or* a facility created by Act No. 152 of the Public Acts of 1885, as amended, being sections 36.1 to 36.12 [*the Michigan Veterans' Facility*] of the Michigan Compiled Laws, *that provides organized nursing care and medical treatment to 7 or more unrelated individuals suffering or recovering from illness, injury, or infirmity.* [Emphasis added.]

The Public Health Code excludes the Michigan Veterans' Facility from the definition of a nursing home, presumably because the facility has its own statutory scheme governing its operation, MCL 36.1 *et seq.*; MSA 4.871 *et seq.* Thus, the Legislature's exclusion of the facility from this definition does not indicate that the facility was not performing the same functions as a nursing home.

In addition to defining a nursing home, the Public Health Code, under MCL 333.21715; MSA 14.15(21715), requires that a nursing home offer cer-

---

[7] See n 6.

tain kinds of care and services that aptly describe those provided by the facility in this case:

> (1) A nursing home shall provide:
>
> *       *       *
>
> (b) *A program of planned and continuing medical care under the charge of physicians.*
> (2) Nursing care and medical care shall consist of services given to individuals who are subject to *prolonged suffering* from illness or injury *or who are recovering* from illness or injury. The services shall be within the ability of the home to provide and shall include the functions of medical care such as diagnosis and treatment of an illness; nursing care via assessment, planning, and implementation; evaluation of a patient's health care needs; and *the carrying out of required treatment prescribed by a physician.* [Emphasis added.]

This description highlights one of the critical differences between the statutory definition of "hospital" and the Public Health Code's definition of "nursing home." A "hospital" treats patients with acute medical needs by providing "active" treatment for patients with conditions "requiring" daily physician direction or supervision.   MCL   691.1407(4)(b);   MSA 3.996(107)(4)(b)   and   MCL   333.20106(5);   MSA 14.15(20106)(5).   In   contrast,   a   "nursing   home" addresses the long-term medical needs of individuals subject to "prolonged suffering" or who are "recovering" from an illness or injury by providing "[a] program of planned and continuing medical care under the charge of physicians." MCL 333.21715;   MSA 14.15(21715).

By excluding hospitals from its definition of nursing homes, the Public Health Code makes the defini-

tions of these two kinds of health facilities mutually exclusive. In doing so, the Public Health Code is able to require hospitals to seek licensure, MCL 333.21501 *et seq.*; MSA 14.15(21501) *et seq.*, separate from the licensure provisions for nursing homes, MCL 333.21701 *et seq.*; MSA 14.15(21701) *et seq.* Thus, under the Public Health Code, a nursing home cannot also be a hospital.

Relying on the definitions of the Public Health Code, this facility performs the same function as a nursing home. It is not a hospital under the Public Health Code and, therefore, is not a hospital under the public hospital exception. Moreover, the Public Health Code is careful to treat hospitals, nursing homes, and the Michigan Veterans' Facility separately, recognizing their separate statutory identities. Thus, when the Legislature enacted 1986 PA 175, removing governmental immunity from hospitals and from county medical care facilities, it did not remove the facility's governmental immunity because it failed to identify the facility when it excluded these other public institutions from the statute's general protection.

B

Also, the facility and Michigan Department of Public Health presented the sworn affidavit of Walter Wheeler, Chief of the Bureau of Health Facilities of the Department of Public Health. He noted the distinction between a nursing home and a hospital under the Public Health Code and explained why the Department of Public Health did not consider the facility a hospital. Because the Department of Public Health is responsible for the licensure and certification of health facilities under the Public Health Code, MCL 333.20131(1); MSA 14.15(20131)(1), this Court gives great deference to the

construction it places on the code as represented by Wheeler's testimony. *Bruehan v Plymouth-Canton Community Schools*, 425 Mich 278, 282-283; 389 NW2d 85 (1986).

Wheeler swore that, under the definition of "hospital" in the Public Health Code, the Department of Public Health did not consider the Michigan Veterans' Facility a hospital because it did not provide the requisite degree of daily supervision:

> By definition, a hospital is limited to patients with conditions requiring the "daily direction or supervision of a physician." *The Department of Public Health Bureau of Health Facilities considers this high degree of physician supervision to be indicated where a patient's chart reflects daily physician orders, daily physician's progress notes, or nursing notes stating that a patient has been seen by a physician on a daily basis. The Michigan Veterans' Facility does not provide these services.* [Emphasis added.]

Dr. Wheeler explained that the facility does provide nursing care consistent with the Public Health Code's definition, MCL 333.21715; MSA 14.15(21715), but is exempt from licensure as a nursing home, MCL 333.21711(3); MSA 14.15(21711)(3).[8] The facility is not licensed to provide services as a hospital, and Wheeler swore that it would not qualify as a hospital if it sought licensure because it does not have an

---

[8] Section 21711(3) provides:

A person shall not purport to provide formal or informal nursing care services of the kind normally provided in a nursing home without obtaining a license as provided in this article. This subsection does not apply to a hospital or a facility created by Act No. 152 of the Public Acts of 1885, as amended, being sections 36.1 to 36.12 [Michigan Veterans' Facility] of the Michigan Compiled Laws.

organized medical staff, MCL 333.21513; MSA 14.15(21513).

In requiring that "a patient's chart reflect[ ] daily physician orders, daily physician progress notes, or nursing notes stating that a patient has been seen by a physician on a daily basis," Dr. Wheeler confirms my understanding of what constitutes "daily" physician supervision or direction under the public hospital exception. I think that if this Court concludes that the term "daily" creates an ambiguity in the public hospital exception's definition, it should rely on the sworn statement of an administrator who implements the Public Health Code from which the definition of "hospital" is taken, rather than relying on its own independent knowledge of this area by speculating on what it "would find . . . surprising" in a rehabilitation hospital or by referring to what "common experience" indicates occurs in a general acute care hospital. See *ante*, p 137, n 9.[9] Under Dr. Wheeler's description of what constitutes daily physician supervision or direction, there can be no dispute that the facility does not offer this kind of service.

CONCLUSION

I do not believe that the Michigan Veterans' Facility is a "hospital" under the definition provided in the public hospital.exception of the governmental immunity statute. The facility does not provide active treatment of conditions requiring *daily* physician direction or super-

---

[9] I also have reservations about the majority's speculation about what is happening "in today's health care world." See *ante*, p 137, n 8. There is nothing in the record to support its conclusion that hospitals are releasing patients who require daily physician direction or supervision to nursing homes.

vision. I would affirm the decision of the Court of Appeals.

BRICKLEY, C.J., and WEAVER, J., concurred with RILEY, J.