HENRY L MEYERS MOVING & STORAGE v MICHIGAN LIFE AND
HEALTH INSURANCE GUARANTY ASSOCIATION

Docket Nos. 185793, 185807. Submitted October 2, 1996, at Grand Rapids.
Decided April 11, 1997, at 9:10 A.M.

Henry L. Meyers Moving & Storage, J.A.G. Sales, Inc., and other small
businesses and their employee benefit plans that purchased various
insurance and annuity contracts from Inter-American Life Insur-
ance Company of Illinois brought an action in the Kent Circuit
Court against the Michigan Life and Health Insurance Guaranty
Association, alleging that the defendant was obligated by statute to
guarantee, assume, or reinsure certain of the plaintiffs' insurance
and annuity contracts following the plaintiffs' insurer's insolvency
and liquidation. The trial court, Robert A. Benson, J., entered an
order granting summary disposition for plaintiffs J.A.G. Sales, Inc.,
and J.A.G. Sales, Inc. Group Life Plan against the defendant and
granting partial summary disposition for the defendant against the
remaining plaintiffs. The defendant appealed from the part of the
order granting summary disposition for J.A.G. Sales, Inc., and
J.A.G. Sales, Inc. Group Life Plan (hereafter collectively referred to
as J.A.G.). (Docket No. 185793). The remaining plaintiffs appealed
from the part of the order granting partial summary disposition for
the defendant. (Docket No. 185807). The appeals were consoli-
dated.

The Court of Appeals *held*:

1. Pursuant to MCL 500.7708(6)(a)(i); MSA 24.17708(6)(a)(i), the
defendant did not have an obligation to convert J.A.G.'s group pol-
icy to individual policies or to credit those individual policies with
springing cash values. If J.A.G. asked the defendant to convert the
group policy into individual, universal life policies as the defendant
contends, the defendant is entitled to summary disposition pursu-
ant to § 7708(6)(a)(i). If J.A.G. asked the defendant to continue its
group policy with a conversion provision similar to the policy
J.A.G. had with Inter-American, J.A.G. is entitled to summary dispo-
sition pursuant to MCL 500.7708(6)(c)-(e); MSA 24.17708(6)(c)-(e).
The record does not indicate precisely what relief J.A.G. sought.
The matter must be remanded to the trial court for further
proceedings.

2. The trial court did not err in determining that the unallocated annuity contracts that plaintiffs Henry L. Meyers Moving & Storage, Marshall, Brass, Smith-Winchester, Wolverine Sign Works, Xact Products, and Yankee Screw Products bought from Inter-American were not covered plans under the Michigan Life and Health Insurance Guaranty Association Act, MCL 500.7701 *et seq.*; MSA 24.17701 *et seq.*, because the contracts were protected under the federal Pension Benefit Guaranty Corporation (PBGC). The plaintiffs' employees' pension benefits remain protected as Congress intended that they be protected under the Employee Retirement Income Security Act of 1974 (ERISA), 29 USC 1001 *et seq.* As a result, the Legislature did not intend the unallocated annuity contracts to be "covered" within the meaning of MCL 500.7704(3)(g); MSA 24.17704(3)(g).

3. The key event that triggers the PBGC's payment of benefits to pension plan participants is the termination of the plan. 29 USC 1361. Congress only intended that the PBGC guarantee the payment of benefits to participants and beneficiaries of pension plans that have been terminated.

4. The statutory scheme adopted by Congress in its passage of the ERISA, including Congress' decision that the PBGC only protect pension beneficiaries and that plan sponsors maintain responsibility to the PBGC for the unfunded benefit liabilities, was known to the Legislature when it adopted 1989 PA 302, which amended MCL 500.7704; MSA 24.17704 and governs the scope of coverage provided by the Michigan Life and Health Insurance Guaranty Association Act. The fact that the plaintiffs have not terminated their plans and their participants have not received payment of guaranteed benefits from the PBGC does not mean that the pension plans involved are not protected by the PBGC. Until the plans terminate, the plan sponsors continue to maintain the responsibility to fund the plans to provide pension benefits to participants. The plan sponsors can terminate the plans under certain provisions of the ERISA and rely on the PBGC to pay guaranteed benefits to the plan participants if certain requirements are met. However, it was not the Legislature's intention that the plaintiffs look to the state guaranty fund to provide benefits for the failure of an asset within the plans.

5. Nothing within 1989 PA 302 impairs the plaintiffs' contracts with Inter-American and the plaintiffs did not have a contract with the defendant that the amendment could have impaired. The plaintiffs had no vested rights as against the defendant, and the amendment did not abrogate that which did not exist. Therefore, the trial court properly rejected the plaintiffs' argument that § 7704(3)(g) is

inapplicable because it was not enacted until after the plaintiffs purchased the Inter-American contracts. The defendant's obligations, if any, to the plaintiffs under MCL 500.7702(1); MSA 24.17702(1) arose upon Inter-American's insolvency on December 23, 1991, which was almost two years after the effective date of 1989 PA 302.

Affirmed in part and remanded.

1. INSURANCE — MICHIGAN LIFE AND HEALTH INSURANCE GUARANTY ASSOCIATION — EMPLOYEE BENEFIT PLANS — FEDERAL PENSION BENEFIT GUARANTY CORPORATION.

The Michigan Life and Health Insurance Guaranty Association Act provides coverage to unallocated annuity contracts subject to certain exceptions; an unallocated annuity contract issued to an employee benefit plan protected under the federal Pension Benefit Guaranty Corporation is not provided coverage by the act (29 USC 1001 et seq.; MCL 500.7704[3][g]; MSA 24.17704[3][g]).

2. INSURANCE — FEDERAL PENSION BENEFIT GUARANTY CORPORATION — EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974 — MICHIGAN LIFE AND HEALTH INSURANCE GUARANTY ASSOCIATION ACT — WORDS AND PHRASES — PROTECTED UNDER THE PENSION BENEFIT GUARANTY CORPORATION.

The role that the federal Pension Benefit Guaranty Corporation plays in paying guaranteed benefits when a pension plan is terminated as a result of the insolvency of the plan indicates that Congress primarily chose to protect beneficiaries of pension plans and not the plans' sponsors; a key event that triggers the PBGC's payment of benefits to plan participants is the termination of the plan; the guaranty provisions of the federal Employee Retirement Income Security Act of 1974 do not contemplate the payment of PBGC benefits when a particular asset within a pension plan fails; the PBGC benefits are available only if the plan itself fails; until a pension plan protected under the PBGC terminates, the plan may be considered to be "protected" under the PBGC for purposes of subsection 7704(3)(g) of the Michigan Life and Health Insurance Guaranty Association Act (29 USC 1001 et seq.; 29 USC 1361; MCL 500.7704[3][g]; MSA 24.17704[3][g]).

3. INSURANCE — MICHIGAN LIFE AND HEALTH INSURANCE GUARANTY ASSOCIATION.

The obligations of the Michigan Life and Health Insurance Guaranty Association under the Michigan Life and Health Insurance Guaranty Association Act do not arise until an insurer becomes impaired or insolvent (MCL 500.7702[1]; MSA 24.17702[1]).

*Warner Norcross & Judd LLP* (by *Paul T. Soren-sen*), for J.A.G. Sales, Inc., and J.A.G. Sales, Inc. Group Life Plan, Henry L. Meyers Moving & Storage, Henry L. Meyers Moving & Storage, Inc. Amended and Restated Pension Plan, Marshall Brass, Marshall Brass Company Pension Plan and Trust, Smith-Winchester, Smith- Winchester Inc. Employees' Pension Plan, Wolverine Sign Works, Wolverine Sign Works Pension Plan, Xact Products, Xact Products, Inc. Pension Plan, Yankee Screw Products, and Yankee Screw Products Co. Defined Benefit Plan & Trust.

*Colpean & Associates, P.C.* (by *John C. Colpean* and *Matthew H. Rick*), for the Michigan Life and Health Insurance Guaranty Association.

Amicus Curiae:

*Jorden Burt Berenson & Johnson* (by *Waldemar J. Pflepsen, Jr.*, and *Stephen H. Goldberg*), for National Organization of Life and Health Insurance Guaranty Associations.

Before: FITZGERALD, P.J., and O'CONNELL and T. L. LUDINGTON*, JJ.

PER CURIAM. These consolidated cases arise from plaintiffs' claims that defendant, Michigan Life and Health Insurance Guaranty Association, was obligated by statute to guarantee, assume, or reinsure plaintiffs' insurance and annuity contracts following plaintiffs' insurer's insolvency and liquidation. In Docket No. 185793, defendant appeals as of right the order granting summary disposition for plaintiff J.A.G. Sales,

---

* Circuit judge, sitting on the Court of Appeals by assignment.

Inc., and its employee benefits plan, J.A.G. Sales, Inc. Group Life Plan (hereafter collectively referred to as J.A.G.). In Docket No. 185807, plaintiffs[1] appeal the order granting partial summary disposition for defendant.

Defendant is a nonprofit association composed of insurance companies that are licensed to sell life and health insurance products and annuities in Michigan. The association was created by the Michigan Legislature in 1982 under the Michigan Life and Health Insurance Guaranty Association Act, chapter 77 of the Insurance Code, MCL 500.7701 et seq.; MSA 24.17701 et seq., to guarantee, assume, or reinsure obligations owed by member impaired or insolvent life and health insurance companies to Michigan residents and certain nonresidents. When a member insurance carrier becomes insolvent and unable to meet its contractual obligations, defendant is required to provide benefits and coverage, subject to certain limitations and exclusions, to the affected policyholders.

Plaintiffs are small businesses that established employee benefit plans that purchased various insurance and annuity contracts from Inter-American Life Insurance Company of Illinois. On December 23, 1991, Inter-American was declared insolvent and ordered liquidated by an Illinois court of competent jurisdiction. Because Inter-American went bankrupt and was unable to perform its obligations to its policyholders, the coverage protection of the act was triggered. MCL 500.7705(g); MSA 24.17705(g). The controversies in these cases involve the extent of coverage that defendant must provide under the act.

---

[1] Excluding J.A.G. Sales, Inc., and its group life plan.

Plaintiff J.A.G. Sales, Inc., sponsored a tax-qualified defined employee benefit plan named the J.A.G. Sales, Inc. Group Life Plan. In 1985, the plan purchased continuous group life insurance contracts. The continuous life policy, however, included a conversion option that allowed employees to convert the group coverage to individual universal life policies upon certain events, such as an employee's retirement or contract termination. According to the parties, in the second year following conversion to the individual policy, the policy was intended to acquire a cash value, which is referred to as a "springing cash value," and the cash value was intended to continue to increase each year thereafter. The policy, however, did not contain a method for crediting a retiree's policy with cash value.

Policyholders under the plan had not converted their group term coverage to special conversion policies when Inter-American was declared insolvent. Upon learning of Inter-American's insolvency, the plan requested Inter-American to provide coverage. Defendant, which began administering the Michigan contracts of Inter-American after its insolvency, determined that it was obligated to provide limited coverage on the continuous group contracts pursuant to § 7708(6) of the act, MCL 500.7708(6); MSA 24.17708(6). However, defendant also determined that it was not required to provide coverage for the contracts' term of conversion pursuant to MCL 500.7708(6)(a)(i); MSA 24.17708(6)(a)(i). Defendant was willing, however, to provide J.A.G. with substitute coverage under MCL 500.7708(6)(c); MSA 24.17708(6)(c), if the policyholders could prove that

they were ineligible for replacement coverage. J.A.G. failed to do so, and instead filed this action for declaratory judgment.

The parties filed separate motions for summary disposition. Following a hearing with regard to the motions, the trial court determined that defendant erroneously denied coverage of the term of conversion pursuant to § 7708. The trial court reasoned that the exclusions to coverage were found in § 7704 of the act, MCL 500.7704; MSA 24.17704, and that § 7704 did not exclude the term of conversion. Defendant agrees with the trial court's ruling that the continuous group contracts are not excluded from coverage, but contends that there are limitations on such coverage pursuant to § 7708(6) and that J.A.G.'s contract does not create a contractual obligation to provide a policy with springing cash value.

Defendant contends that the trial court erred in concluding that the act requires defendant to provide coverage for the terms of conversion in the contract between J.A.G. and Inter-American. Because the parties agree on the facts, but do not agree on how the act applies to those facts, the act must be interpreted to determine whether J.A.G. was entitled to judgment as a matter of law. *Borman v State Farm Fire & Casualty Co*, 198 Mich App 675, 678; 499 NW2d 419 (1993).

The primary goal of judicial interpretation of statutes is to ascertain and effectuate the intent of the Legislature. *Farrington v Total Petroleum, Inc*, 442 Mich 201, 212; 501 NW2d 76 (1993). This Court looks to the specific statutory language to determine the intent of the Legislature. *House Speaker v State Administrative Bd*, 441 Mich 547, 567; 495 NW2d 539

(1993). The Legislature is presumed to intend the meaning that the statute plainly expresses. *Vargo v Sauer*, 215 Mich App 389, 395; 547 NW2d 40 (1996). Judicial construction of a statute is not permitted where the plain and ordinary meaning of the language is clear. *Tryc v Michigan Veterans' Facility*, 451 Mich 129, 136; 545 NW2d 642 (1996).

The scope of coverage provided by the act is governed by MCL 500.7704; MSA 24.17704, as amended by 1989 PA 302, effective January 3, 1990. The act provides coverage to specified contracts, subject to limitations:

> Except as provided in subsection (3), this chapter shall provide coverage to a person specified in subsection (1) for direct, nongroup life, health, annuity, and supplemental policies or contracts, for certificates under direct group life, health, annuity, and supplemental policies and contracts, for legal expense insurance policies, and for unallocated annuity contracts issued by member insurers, *except as limited by this chapter.* [MCL 500.7704(2); MSA 24.17704(2) (emphasis added).]

Defendant's powers and duties with respect to group life insurance contracts are controlled by MCL 500.7708; MSA 24.17708. When an insurer becomes insolvent, defendant has two general options regarding group life insurance contracts. MCL 500.7708(5); MSA 24.17708(5) provides in pertinent part:

> If a member insurer is an insolvent insurer, the association shall do either of the following:
>
> (a) Guarantee, assume, or reinsure, or cause to be guaranteed, assumed, or reinsured, the covered policies of the insolvent insurer or assure payment of the contractual obligations of the insolvent insurer . . . .

(b) With respect to life and health insurance policies, provide benefits and coverage pursuant to subsection (6).

Here, defendant elected to treat J.A.G.'s claims under § 7708(5)(b), which allows coverage pursuant to § 7708(6). Subsection a(i) of § 7708(6) provides:

(a) The association shall assure payment of benefits for premiums identical to the premiums and benefits, *except for terms of conversion and renewability*, that would have been payable under the policies of the insolvent insurer for claims incurred as follows:

(i) With respect to a group policy, not later than the earlier of the next renewal date under the policy or contract or 45 days, but not less than 30 days, after the date on which the association becomes obligated with respect to the policy. [Emphasis added.]

Pursuant to the plain language of § 7708(6)(a)(i), defendant did not have an obligation to convert the group policy to individual policies or to credit those individual policies with springing cash values. J.A.G., however, disputes defendant's claim that J.A.G. requested defendant to issue to J.A.G.'s employees individual, special conversion policies credited with cash value. J.A.G. claims that J.A.G. did not make a *claim for benefits*, but rather that J.A.G. requested defendant to continue the continuous group coverage with the conversion provisions that J.A.G. had in its contract with Inter-American.

We are unable to discern from the record presented what J.A.G. requested defendant to do. If J.A.G. asked defendant to convert the group policy into individual, universal life policies as defendant contends, defendant is entitled to summary disposition pursuant to § 7708(6)(a)(i). If, however, J.A.G. asked defendant to continue its group policy with a conversion provision

similar to the policy J.A.G. had with Inter-American, J.A.G. is entitled to summary disposition pursuant to § 7708(6)(c)-(e). Because we are unable to determine precisely what relief J.A.G. sought from defendant, we remand the case to the trial court for further proceedings consistent with this opinion. *Skinner v Square D Co*, 445 Mich 153, 160; 516 NW2d 475 (1994).

DOCKET NO. 185807

Plaintiffs Henry L. Meyers Moving & Storage, Marshall Brass, Smith-Winchester, Wolverine Sign Works, Xact Products, and Yankee Screw Products sponsored tax-qualified defined employee benefits for their respective employees. Plaintiffs purchased from Inter-American term plus contracts and guaranteed investment contracts (GICs). The term plus contracts combined decreasing term life insurance and an unallocated group annuity contract. The GICs were traditional unallocated group annuities. Defendant determined that the act provides coverage for unallocated annuities, MCL 500.7704(2); MSA 24.17704(2), subject to certain statutory limitations. Defendant, however, determined that the Inter-American contracts were protected under the federal Pension Benefit Guaranty Corporation (PBGC) and, therefore, denied plaintiffs' request for coverage under MCL 500.7704(3)(g); MSA 24.17704(3)(g).

The parties filed separate motions for summary disposition. Following a hearing regarding the motions, the trial court determined that the Michigan Legislature did not intend for the act to provide coverage for plans that are protected by the PBGC. The trial court also rejected plaintiffs' argument that 1989 PA 302,

which added § 7704(3)(g) to the act, was retroactively applied to preclude coverage of the Inter-American contracts. Hence, the trial court granted defendant's motion for summary disposition and denied plaintiffs' motion for summary disposition.

I

Plaintiffs first contend that the trial court erred in determining that plaintiffs' unallocated annuity contracts were not covered plans under the act because the contracts were protected under the PBGC. Because the parties agree on the facts, but do not agree on whether a statutory exception applies to those facts, the act must be interpreted to determine whether defendant was entitled to judgment as a matter of law. *Borman, supra* at 678.

Pursuant to § 7704(2), the act provides coverage to unallocated annuity contracts subject to limitations. An exception to coverage for unallocated annuities issued to employee benefit plans protected under the PBGC is provided in § 7704(3)(g):

> This chapter shall not provide coverage for the following:
> (g) An unallocated annuity contract issued to an employee benefit plan protected under the federal pension benefit guaranty corporation. [MCL 500.7704(3)(g); MSA 24.17704(3)(g).]

The critical inquiry, therefore, is whether plaintiffs' plans are "protected" under the PBGC within the meaning of the language chosen by the Legislature in 1989.

Plaintiffs contend that their pension plans have not, to date, received any protection from the PBGC. We do not disagree with that contention as an accurate statement of the record below. We do believe, how-

ever, that plaintiffs' employees' pension benefits remain protected as Congress intended that they be protected under the Employee Retirement Income Security Act of 1974 (ERISA), 29 USC 1001 *et seq.*, and that, as a result, the Legislature did not intend the unallocated annuity contracts to be "covered" within the meaning of § 7704(3)(g).

Title IV of the ERISA creates the PBGC and charges it with administering the termination insurance program for single- and multi-employer plans. The ERISA is a comprehensive federal statutory scheme that regulates employee benefits provided by private employers and that preempts state employee benefit law. 29 USC 1144. The ERISA seeks to protect vested pension benefits and to ensure the availability of those benefits to plan participants and beneficiaries through certain insurance provisions. 29 USC 1302(a). All qualified pension benefit plans, including defined benefit plans, are covered by the ERISA's termination insurance provision. The ERISA created the PBGC to effectuate and administer the termination insurance provisions. *Id.*

It is undisputed that plaintiffs' plans are qualified, defined pension plans that are eligible for termination insurance coverage through the PBGC. However, plaintiffs argue that their plans are not protected for purposes of § 7704(3) because the PBGC did not protect plaintiffs from their losses. A review of the role the PBGC plays in paying guaranteed benefits when a pension plan is terminated as a result of the insolvency of the plan indicates that Congress primarily chose to protect beneficiaries of pension plans and not the plans' sponsors.

When a pension plan is terminated, the PBGC may be called upon to provide benefits to the plan's beneficiaries. "Under ERISA's pension plan termination insurance program, PBGC guarantees that certain plan benefits *will be paid to beneficiaries even if a plan terminates with insufficient funds to make payments.*" 5 RIA Pension Coordinator, § 58,501 (New York: Research Institute of America) (emphasis added). The PBGC guarantees the payment of all nonforfeitable benefits, other than benefits becoming nonforfeitable solely on account of the termination of the plan. 29 USC 1322(a). Congress has established a maximum guaranteed benefit that is covered by the PBGC. See 29 USC 1322(b)(3). However, the key event that triggers the PBGC's payment of benefits to plan participants is the termination of the plan. 29 USC 1361.

Plans may be terminated either voluntarily or involuntarily. There are two types of voluntary terminations—standard and distress terminations. While there are various requirements that must be complied with for a standard termination, the key requirement is that the plan has sufficient assets to fund employee benefit liabilities as of the termination date. 29 USC 1341(b)(1)(D).

In order to terminate the plan under the distress termination provisions, plan sponsors must provide notice to each affected party of the intent to terminate the plan and must provide information to the PBGC regarding the assets and liabilities of the plan, and the PBGC must determine that the necessary distress criteria are met. 29 USC 1341(c)(1). The necessary distress criteria are (i) liquidation in bankruptcy or insolvency proceedings, or (ii) reorganization in

bankruptcy or insolvency proceedings, or (iii) the fact that termination is required to enable payment of debts while staying in business or to avoid unreasonably burdensome pension costs caused by a declining workforce. 29 USC 1341(c)(2)(B)(i)-(iii). The determination of the final criteria is met by demonstrating the following to the satisfaction of the PBGC:

> (I) unless a distress termination occurs, [the plan sponsor] will be unable to pay [it's] debts when due and will be unable to continue in business, or
>
> (II) the costs of providing pension coverage have become unreasonably burdensome to such person, solely as a result of a decline of such person's workforce covered as participants under all single-employer plans of which such person is a contributing sponsor. [29 USC 1341(c)(2)(B)(iii).]

In an involuntary termination, the PBGC shall institute proceedings to terminate a plan whenever the corporation determines that the plan does not have assets available to pay benefits that are currently due under the terms of the plan. 29 USC 1342(a).

If a plan is terminated under a standard voluntary termination, the plan sponsor has no liability to the PBGC because there are sufficient assets in the plan to address liabilities. However, plan sponsors are potentially liable to the PBGC if a plan is terminated as a result of a distress termination or an involuntary termination. 29 USC 1362. Congress has provided that a plan sponsor shall be liable to the PBGC for the total amount of unfunded benefit liabilities to all participants and beneficiaries under the plan. 29 USC 1362(b); *A-T-O, Inc v Pension Benefit Guaranty Corp*, 634 F2d 1013 (CA 6, 1980).

"A contributing sponsor's liability to the PBGC is based on the total amount of 'unfunded benefit liabili-

ties,' as of the 'termination date,' for all benefits promised by the plan . . . , together with interest (at a reasonable rate) calculated from the termination date under regulations prescribed by the PBGC ∶ . . ." 5 RIA Pension Coordinator, *supra*, § 61,120 (citing 29 USC 1362(b)(1)(A). A plan sponsor's liability for the unfunded benefit liabilities is payable to the PBGC as of the termination date. 29 USC 1362(b)(2)(A); 5 RIA Pension Coordinator, *supra*, § 61,122. However, the ERISA also provides that a plan sponsor's net worth can limit the amount of the lien that may be imposed for nonpayment. 29 USC 1362(b)(2)(B); 5 RIA Pension Coordinator, *supra*, § 61,122. It is clear from the manner in which Congress enacted the ERISA that it intended that the plan sponsor be ultimately responsible for the continued payment of pension benefits by imposing liability on the sponsor while also providing a means for the sponsor to continue in business.

Congress only intended that the PBGC guarantee the payment of benefits to participants and beneficiaries of pension plans that have been terminated. The guaranty provisions of the ERISA do not contemplate the payment of PBGC benefits when a particular asset within a pension plan fails. The PBGC benefits are available only if the plan itself fails.

The statutory scheme adopted by Congress in its passage of the ERISA, including Congress' decision that the PBGC only protect pension beneficiaries and that plan sponsors maintain responsibility to the PBGC for the unfunded benefit liabilities, was known to the Legislature when they adopted the 1989 amendment. The fact that plaintiffs have not terminated their plans and their participants have not received payment of guaranteed benefits from the PBGC does not

mean that the pension plans involved in this case are not protected by the PBGC. Until the plans terminate, the plan sponsors continue to maintain the responsibility to fund the plans to provide pension benefits to participants. The plan sponsors can terminate the plans under the distress termination provisions and rely on the PBGC to pay guaranteed benefits to the plan participants if the responsibility to fulfill the requirements to fund the pension plans would result in an unreasonably burdensome economic cost. However, it was not the Legislature's apparent intention that the plaintiffs look to the state guaranty fund to provide benefits for the failure of an asset within the plans.

II

Plaintiffs also argue that § 7704(3)(g) is inapplicable because it had not been enacted until after the plaintiffs purchased the Inter-American contracts.[2] The trial court rejected this argument, stating:

> This Court does not perceive this to be a retroactive application problem. This Court agrees with the plaintiffs that the Legislature did not, in the Act itself, show any intention to have retroactive application of the Act. However, the 1990 amendment [1989 PA 302] deals with the Michigan Life and Health Insurance Guaranty Association and not with any vested rights between the bankrupt insurance company and the insured. The provisions of the MLHIGA Act in effect at the time of the insolvency of the insurance company are what governs, in this Court's opinion.

---

[2] This argument is inapplicable to plaintiffs Yankee Screw Products and Wolverine Sign Works because their contracts did not become effective until after the January 3, 1990, effective date of 1989 PA 302.

Plaintiffs argue that the 1989 amendment impairs their previously acquired contract rights because plaintiffs' contracts with Inter-American were completed before January 1, 1990. See *In re Certified Questions (Karl v Bryant Air Conditioning Co)*, 416 Mich 558, 570; 331 NW2d 456 (1982). Plaintiffs' argument, however, misapprehends the proper inquiry. The inquiry focuses on how the statute acts to impair plaintiffs' contracts. *Campbell v Judges' Retirement Bd*, 378 Mich 169, 180-181; 143 NW2d 755 (1966). Plaintiffs have not pointed to a single provision contained within the 1989 amendment that impairs plaintiffs' contracts with Inter-American, and plaintiffs had no contract with defendant that the amendment could have impaired.

Plaintiffs also contend that the amendment improperly abrogates a vested right. In *Wylie v Grand Rapids City Comm*, 293 Mich 571, 586-587; 292 NW 668 (1940), the Court described a vested right as:

"[A] right, so fixed that it is not dependent on any future act, contingency or decision to make it more secure."

"A vested right is a present or future right to do or possess certain things not dependent upon a contingency."

\*    ·\*    \*

. . . A few courts have frankly recognized that policy considerations, rather than definitions, are controlling, and have defined a vested right as a right of which the individual could not be deprived without injustice.

"In its application as a shield of protection, the term 'vested rights' is not used in any narrow or technical sense, or as importing a power of legal control merely, but rather as implying a vested *interest which it is right and equitable that the government should recognize and protect, and of which the individual could not be deprived without*

*injustice."* 2 Cooley's Constitutional Limitations (8th Ed), p 745. [Emphasis in original; some citations omitted.]

Plaintiffs identify their vested rights as those contract rights that were acquired when the policies were purchased from Inter-American. Plaintiffs' focus is on the wrong relationship because plaintiffs must show that they had a vested right as against defendant. Nonetheless, the act expressly states that defendant's obligations do not arise until an insurer becomes impaired or insolvent. MCL 500.7702(1); MSA 24.17702(1). Consequently, plaintiffs had no vested rights, and the act could not have abrogated that which did not exist. *In re Certified Questions, supra* at 575. The trial court properly observed that defendant's obligations, if any, to plaintiffs under § 7702(1) arose upon Inter-American's insolvency on December 23, 1991, which was almost two years after the effective date of the amendment.

Affirmed in part and remanded for further proceedings consistent with this opinion. Jurisdiction is not retained.